722 So.2d 1224 (1998)
McKinley KELLER, Plaintiff-Appellant,
v.
Carol AYMOND, Jr., et al., Defendants-Appellees.
Michael J. Johnson, PlaintiffAppellant,
v.
Carol Aymond, Jr., et al., Defendants-Appellees.
Nos. 98-844, 98-843.
Court of Appeal of Louisiana, Third Circuit.
December 23, 1998.
*1225 Keith Wayne Manuel, Marksville, for McKinley Keller.
Mark Anthony Jeansonne, Hessmer, for Carol Aymond, Jr., et al.
Rodney Marchive Rabalais, Marksville, for Avoyelles Publishing Co. et al.
James Michael Percy, Susan C. Segura, Alexandria, for Central Newspapers, Inc.
BEFORE: THIBODEAUX, DECUIR, and GREMILLION, Judges.
THIBODEAUX, Judge.
The plaintiffs in these consolidated cases, Michael J. Johnson and McKinley Keller, sued, among others, the Avoyelles Publishing Company and its publisher, Randy DeCuir, for publishing the contents of their private telephone conversations allegedly intercepted in violation of the Louisiana Electronic Surveillance Act, La.R.S. 15:1301 et seq. The trial court, finding a lack of criminal *1226 willfulness on the part of the newspaper, granted summary judgment to the defendants, and the plaintiffs filed this appeal. Following our de novo review of the record, we reverse the summary judgment granted below due to issues of fact and law.

I.

ISSUES
We must consider:
1) whether the trial court erred in granting summary judgment to DeCuir and Avoyelles Publishing Company due to issues of fact or law regarding the defendants' violation of the Electronic Surveillance Act, R.S. 15:1301 et sequitur;
2) whether a criminal violation of La.R.S. 15:1303 is a prerequisite to a civil action under R.S. 15:1312; and,
3) whether the Electronic Surveillance Act, La.R.S. 15:1301 et seq, violates the constitutional rights of the defendant newspapers.

II.

FACTS
These consolidated lawsuits arise in part from the alleged illegal interception and taping of various private telephone conversations between the plaintiffs, Michael J. Johnson and McKinley Keller, and others. Mr. Johnson and Mr. Keller sued the defendant, Carol Aymond, Jr., alleging that he illegally intercepted and taped their conversations, that is, without the consent of any party involved, in violation of the Electronic Surveillance Act (hereinafter "the Act") at La. R.S. 15:1301, et sequitur. Mr. Aymond then allegedly called a press conference, played the tapes, and distributed copies of the transcripts of the taped conversations to those in attendance, including various newspapers and their associated reporters. The trial court has previously held that Mr. Aymond's actions constituted a "disclosure" under the Act.
The newspapers then allegedly printed excerpts from the contents of the intercepted communications of Mr. Johnson and Mr. Keller. Accordingly, the plaintiffs sued the newspapers, including the defendants herein, the Avoyelles Publishing Company and the publisher and editor/correspondent of the Avoyelles Journal (hereafter collectively referred to as "Avoyelles Publishing"), for publishing the contents of illegally intercepted communications, which is specifically prohibited under the Act at La.R.S. 15:1307. The plaintiffs also allege the newspaper's violation of the Act through "disclosure" and "use" of the intercepted information.
The district court previously granted an Exception of No Cause of Action filed by another defendant, Central Newspapers, which we reversed. Johnson v. Aymond, 97-1466 (La.App. 3 Cir. 4/1/98); 709 So.2d 1072, writ denied, 98-1181 (La.6/19/98); 720 So.2d 1214. The district court then granted a partial summary judgment in favor of Avoyelles Publishing, which we now reverse. The record does not contain a transcript of the summary judgment hearing or written reasons by the trial court explaining its granting of summary judgment in favor of Avoyelles Publishing. However, the record indicates that the trial judge followed the same reasoning articulated in its prior judgment in favor of Central Newspapers, and those written reasons are included in the record. Accordingly, it is not necessary in this case to read the hearing transcript, and we find sufficient information in the record to aid us in our decision in this case.

III.

LAW AND DISCUSSION

Standard of Review
Appellate courts review summary judgments de novo, under the same criteria that govern the district court's consideration of the appropriateness of summary judgment. See Schroeder v. Board of Supervisors, 591 So.2d 342 (La.1991); Benoit v. Roche, 94-715 (La.App. 3 Cir. 6/14/95); 657 So.2d 574. A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to *1227 judgment as a matter of law. La.Code Civ.P. art. 966.

Assignments of Error
Michael Johnson and McKinley Keller contend that the trial court erred in granting partial summary judgment to the defendants, Randy DeCuir and The Avoyelles Publishing Company, due to the existence of material issues of fact and as a matter of law. The plaintiffs further ask whether the court erred in ruling that there must be criminal willfulness by the defendant in violating R.S. 15:1303 before a civil remedy can be sought under R.S. 15:1312, and whether the court erred in holding that the Act was a violation of the defendant newspaper's First Amendment (free speech/free press) rights.

Constitutionality of La.R.S. 15:1301 et seq. Privacy Versus Access
As to the First Amendment violations, in reversing the Exception of No Cause of Action of Central Newspapers, in Johnson v. Aymond, 709 So.2d 1072, we held that the lower court erred in considering the constitutionality of these statutes because the issue was not properly pled and because the Attorney General was not notified of the constitutionality proceeding pursuant to La.R.S. 13:4448.
In declining its jurisdiction to hear the issue, the Louisiana Supreme Court held that the trial court never specifically rendered the Electronic Surveillance Act unconstitutional but stated that "the merits of the case and/or evidence presented at trial will decide the issue of constitutionality of La.R.S. 15:1301, et seq." See Keller v. Aymond, 97-2203, 97-2204 (La.11/19/97); 702 So.2d 1387. Notwithstanding, the Louisiana Supreme Court subsequently declined jurisdiction on the constitutionality issue again and transferred the appeal to this court in Keller v. Aymond, 98-0552, 98-0553 (La.4/23/98); 717 So.2d 1151. Moreover, there is evidence in this record that an "exception based upon unconstitutionality" was filed by the defendant, Aymond, in a prior related proceeding. While the lower court did not declare the entire statute unconstitutional so as to require the Attorney General's involvement, the trial court has twice held that once the illegally intercepted conversation was disclosed by Aymond, any restrictions upon the newspaper from reporting this disclosure would be a violation of the constitutional right of freedom of the press. Accordingly, we will now decide the constitutional issue which has been raised again by both plaintiffs and defendants in their briefs to this court.
The Electronic Surveillance Act, La.R.S. 15:1301 et sequitur, provides generally that it is unlawful to intercept, disclose, or use wire or oral communications unless authorized to do so under color of law and with the consent of at least one of the parties to the communication. Title 15 contains three sections which are pertinent to this case: section 1303, which provides specific remedies in the form of criminal fines and imprisonment for the "willful" interception, disclosure and use of the communication; section 1307, which does not specify a remedy, but prohibits publication and court use of the information; and section 1312, which provides specific civil remedies in the form of monetary damages, including attorney fees and punitive damages, against any person who intercepts, discloses or uses such information.
No Louisiana jurisprudence has interpreted the substance of the Louisiana Act. However, Louisiana's Electronic Surveillance Act was fashioned after its federal counterpart, 18 U.S.C. § 2510 et sequitur, known as Title III's Omnibus Crime Control and Safe Streets Act, and federal law is instructive in the areas where the provisional language coincides.
In the present case, two important constitutional rights conflict. The First Amendment to the United States Constitution and Article 1, Section 7 of the Louisiana Constitution protect the public's right of access to information of legitimate public interest and to a free press. The Fourth Amendment to the United States Constitution and Article 1, Section 5 of the Louisiana Constitution protect an individual's right to conversational privacy. See Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). However, neither right is absolute; each is qualified. See Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (first amendment); Berger *1228 v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (fourth amendment). What is required in this case is a careful balancing of the public's interest in access and of freedom of the press against the individual's privacy interests.
We find the case of Certain Interested Individuals, John Does I-V, Who Are Employees of McDonnell Douglas Corporation v. The Pulitzer Publishing Company, 895 F.2d 460 (U.S. 8th Cir. (Mo.) 1990), cert denied, 498 U.S. 880, 111 S.Ct. 214, 112 L.Ed.2d 173 (1990), most compelling and instructive in deciding this constitutionality issue of first instance in Louisiana. In Pulitzer Publishing, the newspaper sought access to FBI affidavits which were attached to applications for search warrants issued in a federal investigation. The FBI's affidavit was based in large part upon telephone conversations that had been intercepted pursuant to court-ordered wiretaps. The individuals under investigation argued that their privacy rights outweighed the public's interest in access to the information and that Title III, 18 U.S.C.A. § 2510 et seq, protected the materials from disclosure because the materials contain intercepted communications.
The federal statute authorizes wiretaps by law enforcement officers and 18 U.S.C. § 2517(2) authorizes the limited use of the contents in search warrants in order to establish probable cause to search. Other sections of the federal statute provide that properly obtained wiretap information must be sealed but can subsequently be disclosed through testimony under oath. In finding against the newspaper, the court made it clear that the statute authorized disclosure only between agents in the performance of their duties and while giving testimony. The court in Pulitzer Publishing upheld the privacy rights of the intercepted individuals, and its reasoning, as follows, is particularly pertinent under the facts of this case:
Nonetheless, disclosure to a limited audience of "professionally interested strangers" in the context of their official duties is not the equivalent to disclosure to the public. Title III does not allow public disclosure of all lawfully obtained wiretap evidence just because a few officers are privy to its contents; if this were construed to do so, much of the statute would be superfluous.... We do not agree that once wiretap information is used in search warrant affidavits, it is no longer subject to Title III's restrictions upon its use and disclosure. We do not think that Title III's restrictions can be so easily avoided. The use and disclosure of wiretap information in search warrant affidavits pursuant to 18 U.S.C. 2517(2) cannot transform the wiretap information into non-wiretap information unprotected by Title III. Acceptance of this argument would create a very large loophole in Title III.
Pulitzer Publishing, 895 F.2d at 465.
Similarly, in the present case, once the plaintiffs' communications were intercepted and used by Aymond, that initial disclosure did not transform the intercepted communications into non-intercepted communications unprotected by Louisiana's Title 15.
Moreover, the allegedly illegal nature of the interceptions in this case should entitle the plaintiffs to even greater protection than those afforded the investigated individuals in Pulitzer Publishing.
In balancing the public's and the newspaper's right of access against the individual's right of conversational privacy, the Pulitzer Publishing court stated that the absence of an indictment against the individuals was critical because where no indictments had issued against persons allegedly involved in criminal activity, there was a clear suggestion that the Government could not prove the allegations. The court stated that "The court of public opinion is not the place to seek to prove them." Id. at 466. The court further articulated:
Moreover, in the absence of an indictment and a pending criminal trial, individuals whose wiretapped conversations are disclosed have no judicial forum in which they may potentially vindicate themselves or their conduct. Without an indictment, there can be no trial and, from their perspective, no acquittal. Thus, [w]here privacy interests in wiretapped conversations are asserted, the court must consider how disclosure of the information would affect *1229 the persons identified and society's interest in disclosure. A number of factors enter into this analysis, including the extent of public knowledge of the material, the accusatorial nature of the material, and the need for public scrutiny of the government operations disclosed in the material....
Id. at 467.
In the present case, the record contains no evidence that government operations were involved or that the wiretap was legally obtained by law enforcement officers during an investigation. The allegation is that the interceptions were illegally obtained by private citizens. If covert activity was suspected, a legal wiretap should have been ordered, and even that would have been afforded protection. Hence, there is no legitimate public interest to be served by the newspaper's disclosure of the private conversations of the plaintiffs in this case. The plaintiffs had an expectation of privacy in their personal conversations that is clearly protected by the Fourth Amendment to the United States Constitution and by Article 1, Section 5 of our state constitution. Therefore, there is no question that the Electronic Surveillance Act, La.R.S. 15:1301 et seq., which merely creates a method for enforcing the Fourth Amendment's and Article 1, Section 5's protection of conversational privacy, does not unconstitutionally impinge on any freedom of the press protections.
Neither the public nor the press has a right of access to private conversations between private individuals initiated in the privacy of their respective homes. This is particularly true when intercepted individuals have not been indicted for a crime and yet stand to have their reputations and careers seriously damaged by public opinion. We find that the protections against public disclosure of allegedly illegal interceptions in La.R.S. 15:1301 et seq are not only constitutional but are even more important than the protections of legally obtained wiretaps in the federal statute.
Our courts have made it clear that the media does not have unfettered rights of access or rights to publicize the contents of any audio and visual event it so desires without the consent of the parties involved just because the First Amendment and Article 1, Section 7 protect freedom of speech and freedom of the press. In Zacchini v. Scripps-Howard Broadcasting Company, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), the United States Supreme Court unequivocally articulated that the First and Fourteenth Amendments of the Constitution did not immunize a television broadcasting company when it broadcasted a performer's entire act without his consent. In balancing rights, the press is subject to the same restrictions which our law imposes on the general public. Indeed, the press "is responsible for abuse of [the] freedom" given to it. La. Const., art. 1, § 7.
In California First Amendment Coalition v. Calderon, 97-15493 (9th Cir. (Cal.) 7/23/98); 150 F.3d 976, a coalition of press and broadcast journalists challenged the exclusion of witnesses from certain phases of lethal injection executions. There, the prison's Procedure 770 was under attack. It prohibited the public viewing of officials escorting an inmate to the chamber, strapping him to the gurney, and inserting the IV tubes, but allowed observation beginning at the time the lethal drug was running through the IV. Procedure 770 minimized the exposure of the members of the execution team to the media or other witnesses out of concern for staff safety and institutional security. In upholding prison Procedure 770, the court articulated that the First Amendment does not protect the right of the press to gather news not available to the public.
The court's reasoning in Calderon is particularly germane to this case. In Calderon, the court stated that the right of the press to gather news and information is protected by the First Amendment in order to prevent freedom of the press from being eviscerated. However, the court made it clear that, "[a]lthough substantial, the protection is not without limits. For example, the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." Calderon, 150 F.3d at 981, citing Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The Calderon court *1230 then cited other Supreme Court cases limiting the press in its access to inmates. In all cases, the courts found that because the challenged policies did not deny the press access to sources of information available to members of the general public, those policies did not violate the First Amendment. The court expressed its agreement that executions are matters of great public importance, and that more information leads to a better informed public. It further articulated its acknowledgment that the role of the media is important and that, acting as the eyes and ears of the public, it can be a powerful and constructive force, contributing to remedial action in the conduct of public business.
However, the court poignantly observed that "the First Amendment does not protect the right of the press to gather news not available to the public" and that holding is "not predicated upon the importance or degree of interest in the matter reported." Succinctly stated, the press has no First Amendment right of access greater than that of the public. Id. at 982. Similarly, in the present case, the public at large has no right of access to private telephone conversations between individual citizens, and the Louisiana Electronic Surveillance Act further prohibits such access through interception, use and disclosure. Accordingly, those prohibitions are constitutional and are extended to the press. The press cannot escape the prohibitions of the Louisiana Electronic Surveillance Act under the guise of constitutional protection. We find that La.R.S. 15:1301 et seq should be stringently enforced and construed against the violator of any of its sections pursuant to a literal interpretation of the statute as set forth more fully below.

Criminality Is Not Required Under All Sections of The Louisiana Act
The trial court determined that, because an Assistant Attorney General stated in a prior proceeding that he "felt there was no way" to find criminal behavior on the part of the newspapers in printing the contents of the audiotapes, there could also be no civil remedy against Avoyelles Publishing. We disagree. We find that the statutes address criminal and civil violators and provide for criminal and civil penalties. We further find that the illegal interceptor is a criminal violator and is also subject to civil penalties, while the secondary user of the information may be liable criminally and civilly or only civilly depending upon the circumstances surrounding his use of the information. Accordingly, we find that the trial court erred in holding that criminal willfulness must exist on the part of the defendant newspaper before the plaintiffs can claim a civil remedy under La. R.S. 15:1312. Hence, the newspaper can be held civilly liable for publishing the contents of the taped conversation, even if it was not charged in a criminal proceeding or even if the elements of criminal willfulness are lacking.
As stated, Louisiana's Electronic Surveillance Act was fashioned after its federal counterpart, 18 U.S.C. § 2510 et sequitur. However, it is important to note that Louisiana did not adopt many of the provisions of the federal act, and the language varies significantly between the two acts, as do the penalties mandated by each. Therefore, while the defendant newspaper seeks to analogize federal cases interpreting the federal act, we must compare the pertinent language in the applicable provisions before taking instruction from federal cases.

La.R.S. 15:1303 And Federal Statute 18 U.S.C. § 2511
Generally, La.R.S. 15:1303 provides that it is unlawful to willfully intercept a wire or oral communication without color of law and the consent of one of the parties to the communication; and it is illegal to willfully disclose or use the contents of the communication if there is reason to know that it was illegally obtained. Section 1303 does provide for criminal penalties up to $10,000 and imprisonment between two and ten years at hard labor. More specifically, section 1303 provides in pertinent part:
Section 1303. Interception and disclosure of wire, electronic, or oral communications:
A. Except as otherwise specifically provided in this Chapter, it shall be unlawful for any person to:
(1) Willfully intercept, endeavor to intercept, or procure any other person to *1231 intercept or endeavor to intercept, any wire or oral communication;
(2) Willfully use, endeavor to use, or procure any other person to use or endeavor to use, any electronic, mechanical, or other device to intercept any oral communication...
(3) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Subsection; or
(4) Willfully use, or endeavor to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this Subsection.

B. Any person who violates the provisions of this Section shall be fined not more than ten thousand dollars and imprisoned for not less than two years nor more than ten years at hard labor, without benefit of probation, parole, or suspension of sentence. (Emphasis added)
Therefore, section 1303 of Louisiana's Electronic Surveillance Act does provide for criminal penalties and imprisonment, but only for violations under "this Section," that is section 1303. The District Attorney's office has not filed criminal charges in this matter. It is clear from the record that the trial court based its dismissals of the civil suits against Central Newspapers, Inc., and of Avoyelles Publishing on its finding of a lack of criminal intent. More specifically, in the trial court's "Reasons for Ruling" wherein it granted the Exception of No Cause of Action filed by Central Newspapers, the court referenced a prior proceeding, "In Re: A Matter Under Investigation." There, the trial court took cognizance of statements made by a Louisiana Assistant Attorney General indicating that he "felt there was no way" that the State of Louisiana could establish criminal intent on the part of any of the newspapers.
Again, in its Judgment denying the State's Motion to Compel and the Bunkie newspaper's Motion to Quash, the trial court articulated that the "publication of information disclosed at the press conferences" was "not a disclosure as described in Louisiana Revised Statute 15:1303(A)(3)." Hence, it is clear from the court's two prior judgments that it found no criminal disclosure by the newspapers, and used that as a basis for dismissing civil liability claims against them. However, the trial court erred in interpreting the law when it found that all sections of the Act required criminal intent.
Since no Louisiana jurisprudence interprets the Louisiana Act, the defendants cite only federal cases interpreting 18 U.S.C. § 2510 et seq. More particularly, the federal counterpart of La.R.S. 15:1303 above is 18 U.S.C. § 2511, which prohibits the "intentional" interception, disclosure and use of private conversations except by law enforcement officers pursuant to court orders.[1]
The federal statute, 18 U.S.C. § 2511, provides for civil fines of $500 in some instances or imprisonment of up to five years, or both; while the Louisiana statute provides for a fine up to $10,000 and imprisonment of not less than two years and up to ten years. Moreover, the federal statute provides for various levels of offenses, while the Louisiana statute does not. The Louisiana statute carries more stringent penalties and is broader, as more fully explained below. As stated, we find that the Louisiana statute, while it may follow some provisions of the federal statute, is not an adoption of the federal statute. Federal jurisprudence is not controlling but is instructive in certain limited circumstances.
In our previous decision, without determining specifically whether a criminal violation was required, we reversed the Exception of No Cause of Action granted to Central Newspapers, finding that the plaintiffs had stated a cause of action "under the literal language of the Electronic Surveillance Act." Johnson v. Aymond, 709 So.2d at 1075. At *1232 the present time, in reversing the summary judgment granted to Avoyelles Publishing, we specifically hold for the following reasons that criminal intent is not a requirement under all sections of the Louisiana Electronic Surveillance Act and that, as a matter of law, the defendants may be held liable under the Act. More specifically, neither La.R.S. 15:1312 nor La.R.S. 15:1307 requires criminal intent or provides for criminal penalties or imprisonment. Further, section 1307 specifies that "broadcasting" and "publishing" the contents of intercepted communications is prohibited.

La.R.S. 15:1307 Prohibits Use for Broadcasting and Publishing; Federal Statute, 18 U.S.C. § 2515 Does Not
Louisiana Revised Statute 15:1307 provides that the contents of illegally intercepted communications cannot be used as evidence in a court or legislative proceeding and cannot be broadcasted or published. This section, however, does not provide for a specific remedy when the section is violated. Section 1307 provides in pertinent part:
1307. Prohibition of use as evidence or intercepted wire or oral communications A. Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state, or a political subdivision thereof, if the disclosure of that information would be in violation of this Chapter.
B. No person may broadcast, publish, disseminate, or otherwise distribute any part of the content of an electronic communication intercepted in violation of the provisions of this Chapter unless such dissemination or distribution is made to an investigator or law enforcement officer conducting an investigation into a violation of the provisions of this Section.
The words "willful" and "intentional" do not appear in section 1307. Hence, there are no criminal elements necessary for a violation of the Act under section 1307, which prohibits the uses of illegally intercepted conversations in court or legislative proceedings and in broadcasts or publications. The federal statute on the other hand, 18 U.S.C. § 2515, does not contain subsection B's prohibition against broadcasting or publishing the contents of an intercepted conversation. The federal counterpart provides only:
18 U.S.C. 2515. Prohibition of use as evidence of intercepted wire or oral communications
Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.
The federal statute's omission and Louisiana's inclusion of a specific prohibition against broadcasting and publishing illegally intercepted information indicates that the Louisiana legislators anticipated a separate and distinct use of intercepted information not contemplated by the federal statute.
The courts have indicated that these second "uses" of illegally obtained information are prohibited to all, lest the intended protection of our privacy rights have no effect and the statutory proscription of such disclosures are rendered impotent for their intended purpose. In Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972), the United States Supreme Court exhaustively reviewed the legislative history of the federal counterpart of Louisiana's section 1307 and concluded that "the protection of privacy was an overriding congressional concern" when it enacted the federal statute, and that 18 U.S.C. § 2515's "importance as a protection for `the victim of an unlawful invasion of privacy' could not be more clear." Gelbard, 408 U.S. at 50, 92 S.Ct. 2357.
The Gelbard Court reversed contempt findings against witnesses who refused to testify in court to the contents of intercepted *1233 conversations. The Court recognized that an invasion of privacy does not end when an interception occurs, but is compounded by disclosures in court or elsewhere. The Court reasoned that the testimony of witnesses compounds the statutorily proscribed invasion of privacy by adding to the injury of the interception the insult of disclosure. Similarly, in the present case, the impact of this second invasion of privacy by Avoyelles Publishing is not lessened by the circumstances that the disclosing party is merely the recipient of a communication illegally intercepted by an allegedly guilty interceptor.
The Gelbard Court made it clear that Title III makes illegal not only unauthorized interceptions but also the disclosure and use of information obtained through such interceptions. Otherwise, the witness becomes the victim, once again, of a federal crime. Gelbard went on to articulate that even the prosecutor who pursues unchecked a course of conduct involving the use of intercepted communications can subject himself to "heavy civil and criminal penalties." Id. at 52, 92 S.Ct. 2357. In Louisiana, prosecutors, attorneys, courts, newspapers, and entities "disclosing" and "using" illegally intercepted information under La.R.S. 15:1303 are all subject to criminal penalties and imprisonment if they disclose or use the information knowing or having reason to know that it was illegally obtained. However, we also find that these "second users" can be liable for civil penalties under section 1312 without the imprisonment mandated in section 1303. Again, Louisiana's inclusion of a particular violation for broadcasting and publishing this information in a section that does not mandate imprisonment or use the terminology associated with criminal intent, distinguishes the Louisiana statutes from the federal statutes and cases interpreting them.
A literal reading of the statute is mandated by La.Civ.Code art. 9, which instructs that when the law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature. We find that the Louisiana statute is clear and unambiguous, and susceptible of a literal interpretation.
Both plaintiffs have alleged use and publication by the defendant of intercepted communications and have submitted affidavits that they never gave authority or consent for any communication between them to be intercepted, taped, disseminated or published, or used in any way. The defendants, however, have not submitted any rebuttal evidence and in fact have not denied that the contents of the communications were published; instead, publication is impliedly conceded. On the face of section 1307, and under a literal interpretation of that section, the plaintiffs need do no more than prove publication in order to prevail at trial against the defendant newspapers for a violation of section 1307 B.
While summary judgments are now favored to secure a just and speedy determination of actions, pursuant to the 1996 amendment to La.Code Civ.P. art. 966, the burden of proof has not changed. The initial burden is still on the mover, who must show that there is no genuine issue as to material fact and that the mover is entitled to summary judgment as a matter of law. Only after the mover has met its initial burden of production must the opposition submit evidence showing the existence of specific facts establishing a genuine issue of material fact effectively shifting the burden of production to the non-moving party. Pellerin v. Thibodeaux, 98-181 (La.App. 3 Cir. 6/17/98); 716 So.2d 131. We find that Avoyelles Publishing has not met its initial burden and is not entitled to summary judgment.

La.R.S. 15:1312 Provides for Civil Damages Without Criminal Willfulness; Federal Statute, 18 U.S.C. § 2520, Requires Intent
Louisiana Revised Statutes 15:1312 provides no criteria for criminal "willfulness" but only provides for recovery of civil damages, including attorney fees and punitive damages, to persons whose communications have been intercepted without consent of either party. More specifically, Louisiana's section 1312 provides in pertinent part:
1312. Recovery of civil damages authorized

*1234 A. Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this Chapter shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and be entitled to recover from any such person:
(1) Actual damages, but not less than liquidated damages computed at the rate of one hundred dollars a day for each day of violation or one thousand dollars, whichever is greater.
(2) A reasonable attorney's fee and other litigation costs reasonably incurred.
(3) Punitive damages.
B. A good faith reliance on a court order shall constitute a complete defense to any civil or criminal action brought under this Chapter.
The defendants cite Malouche v. JH Management Co., Inc., 839 F.2d 1024 (4th Cir. 1988), which held that civil liability for unlawful wiretapping under the federal counterpart to Louisiana section 1312, which is 18 U.S.C. § 2520, required proof of criminal willfulness. Malouche found that the plaintiff had only "very slight" evidence supporting the factual allegations that his office phone was tapped by the defendant, no evidence as to who installed the device or why, and no evidence that the defendant had knowledge or criminal willfulness under pre-1986 federal statute 18 U.S.C. § 2511. In the present case, the alleged interceptor called a press conference, played the tapes, and handed out hard-copy transcriptions of the tapes. Hence, Malouche is distinguishable where it involved only the alleged criminal interceptor, and did not involve the mere "user" of the previously intercepted information.
Moreover, neither Malouche nor 18 U.S.C. § 2520 is controlling in this case, where the language of the federal statute, section 2520, is different from the language of the Louisiana statute. More specifically, the federal statute provides in pertinent part:
18 U.S.C. 2520. Recovery of civil damages authorized
(a) In general.Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate....
while the Louisiana statute, as previously indicated, provides
1312. Recovery of civil damages authorized
A. Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this Chapter shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and be entitled to recover from any such person ...
Hence, while the federal statute requires an "intentional use," the Louisiana statute does not include the word "intentional" or "willful" in any part of section 1312 providing for civil remedy, but only requires "use." Moreover, federal section 2520 provides that the intercepted party may obtain a civil recovery from "the person" who engaged in the violation, indicating that a civil recovery may be available against the same party who unlawfully intercepted the conversation. As stated, the federal statute does not contain a separately proscribed violation for "publishing" contents illegally obtained by another, while in Louisiana, the publisher and the interceptor can clearly be different parties. This is supported by the language in Louisiana's section 1312 providing that the aggrieved party shall have a civil remedy against "any"person who intercepts or discloses, or uses, the communication, not just "the" person who engaged in the interception.
There exists no Louisiana jurisprudence defining "disclosure" and "use" of the contents of intercepted information under section 1312. Webster's Ninth New Collegiate Dictionary defines disclosure as "exposure," "the act of disclosing;" and defines "disclose" as "to expose to view," "to make known or public." There is no requirement in sections *1235 1303, 1307, or 1312 that the disclosure or use of the contents of the illegally obtained communication must be a first or initial disclosure. In this court's view, there is no tenable argument that would convince this court that a newspaper publication does not make information "known or public." Any argument that attempts to show that a newspaper publication does not disclose or expose information to view is not grounded in logic.
The record indicates that this newspaper defendant disclosed the contents of the subject communications to the public at large, even though its disclosures were secondary to the alleged initial disclosure by Aymond to the press. Likewise, when the newspapers took the information and printed it, they did not merely report allegations made at a recent press conference based upon taped conversations between the plaintiffs; they "used" the contents to sell papers, to solicit advertisements, and for any other uses a paper makes of the information it gathers. Hence, the press's publication of the intercepted information is a "use" and a "disclosure" under sections 1307 and 1312.
Therefore, under a literal interpretation of the Louisiana statute, sections 1307 and 1312, the plaintiffs, Keller and Johnson, may have civil remedies available to them against the newspapers for publishing the contents of their conversation without the necessity of a finding of criminality leading to imprisonment under section 1303. The civil damages under section 1312 are clear and unambiguous, and include actual damages, reasonable attorney fees, and punitive damages. Accordingly, we find that as a matter of law, Avoyelles Publishing is not entitled to summary judgment under sections 1307 and 1312 where criminal willfulness is not required.
As to the "willful" use and disclosure under section 1303 resulting in criminal penalties and imprisonment, the plaintiffs in their Oppositions to the Avoyelles Publishing's Motion for Summary Judgment, attempt to show that the newspaper willfully and intentionally used the information in violation of section 1303. The word willful often denotes an act which is intentional, or knowing, or voluntary, as distinguished from accidental. It may generally mean in a criminal statute that the act was done with a bad purpose; without a justifiable excuse; or stubbornly, obstinately, or perversely. However, "willfully" is also employed to characterize a thing done without ground for believing it is lawful, or conduct marked by careless disregard whether or not one has the right so to act. See United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381 (1933).
The plaintiffs have filed into the record an affidavit attesting that one reporter involved thought that the communications handed out at the press conference were illegally intercepted. Such evidence creates an issue of fact as to the knowledge of the newspaper. Even without evidence of certain knowledge, the circumstances themselves create issues of fact wherein it seems that any reporter handed an audiotape and transcript of a private conversation between parties not in attendance would have "reason to know" that the communications were obtained without consent. Accordingly, summary judgment in favor of Avoyelles Publishing under section 1303 is not appropriate.

IV.

CONCLUSION
Accordingly, we reverse the summary judgment granted by the trial court to Avoyelles Publishing, and we find that as a matter of law, criminal willfulness is not a requirement for civil damages under La.R.S. 15:1312 for "secondary" disclosures and publication of previously intercepted communications under La.R.S. 15:1307. We also find that issues of fact exist regarding the newspaper's "willfulness" of conduct, and its "knowledge" or "reason to know" that the information it published was illegally obtained, precluding summary judgment under La. R.S. 15:1303. Finally, we find that La. R.S. 15:1301 et sequitur violates neither the federal nor state constitutional guarantee of freedom of the press.
We remand for further proceedings.
All costs shall be cast against the defendants-appellees.
REVERSED AND REMANDED.
NOTES
[1] The federal statute, section 2511, uses the word "intentionally" rather than "willfully," as seen in Louisiana section 1303, due to the United States Congressional amendment to 2511 in 1986, substituting the word "intentionally" wherever the word "willfully" had been used.